**JDS UNIPHASE CORPORATION,**
**Plaintiff/Counterclaim–**
**Defendant,**

**v.**

**Robert JENNINGS,**
**Defendant/Counterclaim–Plaintiff.**

**No. 1:06CV200.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 7, 2007.

Charles B. Wayne, DLA Piper Rudnick Gray Cary, Washington, DC, Karen Turner McWilliams, DLA Piper Rudnick Gray Cary US LLP, Reston, VA, for Plaintiff/Counterclaim–Defendant.

Dawn Elise Murphy-Johnson, Collier Shannon & Scott PLLC, Washington, DC, Michael S. Horwatt, Law Offices of Michael Horwatt PC, Reston, VA, for Defendant/Counterclaim–Plaintiff.

### *ORDER*

ELLIS, District Judge.

This matter came before the Court on plaintiff/counterclaim-defendant JDSU's motion for summary judgment on defendant/counterclaim-plaintiff Robert Jennings' counterclaims.[1] JDSU originally sued Jennings, a former JDSU employee, claiming that Jennings' misappropriation of proprietary documents was a breach of contract and fiduciary duty, as well as a conversion and theft of trade secrets. Jennings answered and counterclaimed,

---

1. For ease of reference, the parties will be referred to hereinafter as "JDSU" and "Jennings."

asserting that his termination by JDSU was both (i) a breach of his employment contract and (ii) unlawful retaliation for engaging in protected whistleblowing activities, in violation of the Sarbanes–Oxley Act, 18 U.S.C. § 1514A. In a bench ruling issued on January 19, 2007, summary judgment was granted on the counterclaims in favor of JDSU. This Order records this ruling and the reasons for it.[2]

## I.

Summary judgment must be granted where the record shows "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Here, as JDSU is the counterclaim-defendant, summary judgment on the counterclaims is appropriate unless Jennings demonstrates that a triable issue of fact—that is, a genuinely disputed issue of material fact—exists as to any element of the counterclaim for which Jennings would bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A mere scintilla of evidence is insufficient in this regard; rather, Jennings must adduce evidence sufficient for a reasonable factfinder to find in Jennings' favor on the disputed element. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And where, as here, JDSU's summary judgment motion is made and adequately supported, Jennings may not merely rest on allegations in the pleadings, but must set forth, by affidavit or otherwise, specific facts demonstrating that a triable issue of fact exists. Rule 56(e), Fed.R.Civ.P.

The first step in the analysis is to ascertain whether material facts are disputed. In this regard, as required by Local Rule 56(b), JDSU set out in its moving papers

its list of uncontested facts. Importantly, Local Rule 56(b) requires a brief opposing a motion for summary judgment to include "a specifically captioned section listing all material facts as to which it is determined that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on." Local Rule 56 further provides that the movant's undisputed facts are deemed admitted "unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Here, JDSU submitted a properly captioned statement of undisputed facts with appropriate record citations. Jennings responded with a narrative that did not identify with any specificity which facts, if any, were disputed. In these circumstances Local Rule 56(b) dictates that the Court may "assume that facts identified by the moving party in its listing of material facts are admitted." Accordingly, JDSU's statement of material facts is properly deemed to be undisputed. Those facts may be succinctly summarized as follows.

Jennings was employed by JDSU as Director of its tax accounting. He was previously employed by Acertna, Inc. ("Acertna"), where he was serving in a similar position when JDSU acquired Acertna in August 2005. More specifically, Jennings' job with Acertna required him to identify tax problems and propose solutions to them. While at Acertna, Jennings, in the performance of his duties, brought to the attention of Acertna's CEO and CFO numerous tax issues including, among others, problems with (i) the legal characterization of Acertna's emergence from bankruptcy as a purchase/sale rather than a reorganization, (ii) Acertna's tax characterization of certain stock options, (iii) insufficient payment of profit-sharing in Mexico, (iv) unex-

---

**2.** Issuance of this Order was deferred to allow the parties an opportunity to resolve this matter. Their efforts in this regard did not bear fruit.

plained reserves on the books of the company's German subsidiary, and (v) possible liability for corporate income tax and Value Added Tax in various foreign jurisdictions. The stock option characterization issue was especially controversial, as Jennings disagreed with the opinion of JDSU's outside law firm on this issue, describing it as "laughable." Because Acertna's CEO, CFO, and General Counsel could not agree on a resolution of this issue, the advice of a second law firm was sought, which, in the end, vindicated Jennings' position and resulted in the recharacterization of the options for tax purposes and consequently, greater tax liability for Acertna. Although Jennings had disagreements with Acertna's CEO and CFO regarding these tax issues, he concedes he nonetheless enjoyed a cordial professional relationship with them. In particular, he stated that no one at Acertna ever told him "not to do his job," *i.e.* identify tax problems, nor did anyone at Acertna discourage him from doing so.

When JDSU acquired Acertna in August 2005, it offered Jennings employment as a senior tax executive, in part because of favorable recommendations from Acertna's CEO and CFO. Employed by JDSU at the Director level, Jennings signed a Letter Agreement with JDSU which stated that he could be fired with or without cause, and further defined "cause" to include "willful failure ... to comply with the written or known policies and procedures of the Company including but not limited to the JDS Uniphase Corporate Code of Business Conduct." The Letter Agreement further provided that if Jennings were fired without cause, he would receive severance pay equal to six months of his base salary.

At JDSU, Jennings had two main assignments, namely, (i) devising a new business model to incorporate Acertna into JDSU, and (ii) discovering any hidden tax problems for JDSU. As he did at Acertna, Jennings carried out his assigned task of discovering tax problems for JDSU and discussing them with his superiors, particularly JDSU's CFO, David Vellequette. Jennings' working relationship with Vellequette was similar to the working relationship Jennings had with Acertna's CFO: both were marked by extensive professional discussions of the company's tax problems and constructive differences of opinion on some of these problems, but no personal conflict.

Jennings' troubles at JDSU began on October 12, 2005, when JDSU's Senior Human Resources Manager, Karen Schmidt, made a trip to the office where Jennings was based. While there, Schmidt learned from another employee that Jennings had hired a temporary accounting employee who had never been screened by JDSU's Human Resources (HR) Department.[3] The employee was also employed by an accounting firm where Jennings' ex-wife[4] was a partner. Jennings confirmed to Schmidt that the employee was hired at his direction, and that he had deliberately ignored the JDSU HR Department's hiring procedures and requirements because he found that Department to be "useless." Following this meeting, Jennings advised Schmidt that, although he believed his actions were defensible, he would terminate the temporary employee, noting that "I

---

**3.** Since the employee had not been screened by the JDSU HR Department, he had not passed a background check, signed a nondisclosure form, or provided proof of eligibility to work in the United States, all of which are required to work at JDSU.

**4.** The record reflects that JDSU believed, at the time the temporary employee was hired, that Jennings' wife was a partner at the temporary employee's firm. Jennings contends, and JDSU does not dispute, that in fact Jennings and his wife had divorced by that time.

take full responsibility for my actions and accept the consequences thereof."

The next day, Schmidt wrote an email to her HR Department supervisor and to Vellequette recommending Jennings' termination. She noted that hiring the temporary employee raised questions about the soundness of Jennings' judgment. Schmidt's supervisor agreed, citing Jennings' failure to follow company policy despite his Director-level position. Neither Schmidt nor her supervisor were aware of Jennings' putatively protected whistleblower activity at the time they recommended termination. Vellequette, the JDSU officer who made the final decision regarding termination, agreed that Jennings should be terminated. He relied in part on recommendations for termination from Schmidt, her HR supervisor, and JDSU's in-house counsel. He also relied on his own assessment that Jennings was unable to work effectively with the rest of JDSU's financial team to integrate JDSU and Acertna, one of Jennings' primary responsibilities.

JDSU did not immediately terminate Jennings, because shortly after the termination decision was made in early November 2005, but before it could be implemented, Jennings requested emergency medical leave pursuant to the Family and Medical Leave Act. The next day, JDSU received a letter from Jennings' attorney, claiming that Jennings had been the victim of unlawful retaliation, in violation of the Sarbanes–Oxley Act, 18 U.S.C. § 1514A. JDSU then placed Jennings on paid administrative leave while investigating the allegations. Ultimately, the investigation concluded that Jennings' allegations of unlawful retaliation were unfounded. Accordingly, Jennings was formally terminated on January 30, 2006.

Jennings alleges this termination was, in substance, a wrongful retaliation against him for reporting tax problems to senior management. JDSU denies this and avers that the cause for Jennings' discharge was his temporary engagement of an accountant without the appropriate and required authorization from JDSU's HR Department, as well as Jennings' inability to work effectively with the rest of the JDSU team to integrate JDSU and Acertna.

As a result of these facts, Jennings alleges in his counterclaims that he was terminated in retaliation for whistleblower activity protected by the Sarbanes–Oxley Act, and in violation of his employment contract.

## II.

■ Jennings concedes that JDSU could terminate him without cause under the Letter Agreement, but contends that JDSU breached that agreement by failing to pay him six months pay, as the Agreement required. JDSU responds that Jennings was fired for cause and therefore no severance pay is owed.

The undisputed facts in the summary judgment record make clear that no reasonable factfinder could conclude Jennings was terminated without cause. "Cause" is defined in Jennings' Letter Agreement to include "willful failure . . . to comply with the written or known policies and procedures of the Company, including but not limited to the JDS Uniphase Corporate Code of Business Conduct." It is clear that his hiring of the temporary employee violated JDSU's policies and procedures. By Jennings' own admission, he acted in willful disregard of JDSU's requirement that new employees be screened by the HR Department. Jennings admitted that he bypassed the HR Department because it was "useless," and stated that he was ready to accept the consequences of his decision. Jennings also admitted that the fact that the temporary employee came from the accounting firm where his ex-wife

worked created the appearance of a conflict of interest. Since the hire violated JDSU's company policies and procedures, it constituted "cause" within the meaning of Jennings' Letter Agreement, and JDSU did not violate that agreement by refusing Jennings severance pay. Accordingly, JDSU is entitled to summary judgment on Jennings' breach of contract claim.

## III.

JDSU also moves for summary judgment on Jennings' Sarbanes–Oxley claim. The Sarbanes–Oxley Act provides that publicly traded companies, and their officers, may not retaliate or discriminate against an employee because the employee chose to

> provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes [mail fraud, wire fraud, bank fraud, criminal securities fraud, or violation of] any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by ... any person with supervisory authority over the employee ...

18 U.S.C. § 1514A(a)(1)(C). The analysis first considers the administrative exhaustion requirement, then the merits of the retaliation claim.

### A. Exhaustion

■ Exhaustion of administrative remedies is a statutorily-mandated prerequisite to bringing a Sarbanes–Oxley whistleblower suit. Thus, before a whistleblower may bring a Sarbanes–Oxley action, he must first file a complaint with the Department of Labor (DOL) and exhaust administrative remedies there. *See* 18 U.S.C. § 1514A(b)(1)(A). This exhaustion requirement is jurisdictional. *Willis v. Vie*

*Financial Group, Inc.,* 2004 WL 1774575 at *2 n. 3 (E.D.Pa. Aug. 6, 2004).

The Sarbanes–Oxley Act and implementing regulations establish the following administrative scheme. First, a claimant must file a complaint with OSHA within 90 days after an alleged violation. 29 C.F.R. § 1980.103(d). Next, a claimant must allow the agency at least 180 days to investigate and issue a decision on the merits. At that point, if no decision is issued, the claimant may file a civil action for *de novo* review in the district court. 18 U.S.C. § 1514A(b)(1)(B); 29 C.F.R. § 1980.114(a). This much is uncontroversial; but the exhaustion analysis does not end here. The DOL's Sarbanes–Oxley regulations also purport to require that the complainant file a notice of complaint with the administrative law judge or Administrative Review Board fifteen days before filing a complaint in district court. 29 C.F.R. § 1980.114(b). Because it is undisputed that Jennings did not comply with this notice of complaint requirement, Jennings asserts that the notice of complaint requirement is unlawful, in other words, that the Department of Labor exceeded its statutory authority when it imposed additional jurisdictional requirements beyond those in the text of the Sarbanes–Oxley Act itself. He cites as support a case invalidating a different DOL Sarbanes–Oxley regulation as contrary to the statute, *Welch v. Cardinal Bankshares Corp.,* 454 F.Supp.2d 552 (W.D.Va.2006).

For its part, JDSU argues that regardless of the notice of complaint requirement, Jennings did not exhaust administrative remedies. In this regard, JDSU avers it never received any notice of an OSHA filing by Jennings, never participated in any OSHA proceedings regarding Jennings, and that Jennings himself stated in a deposition that he never spoke with anyone from OSHA. Jennings responds, via an affidavit from his attorney, that he

filed the appropriate administrative complaint on March 8, 2006, within the jurisdictional time limit.

■ To be sure, exhaustion of administrative remedies often entails an agency investigation and agency efforts to conciliate the dispute. While neither appears to have occurred here, it does not necessarily follow that Jennings did not do his part to exhaust. More problematic is the validity of DOL's regulation requiring Jennings to file notice with the administrative law judge and administrative review board, and whether Jennings' failure to comply with this regulation constitutes a failure to exhaust. There is plainly a substantial question whether Jennings properly exhausted his administrative remedies. In the end, it is appropriate to assume without deciding that he did so, inasmuch as JDSU is entitled to summary judgment on the merits, as shown in Part IIIB.[5]

## B. The Merits

■ On review in the district court, a Sarbanes–Oxley retaliation claim is governed by the statutorily-mandated burden of proof scheme set forth in 49 U.S.C. § 42121(b)(2)(B). *See* 18 U.S.C. § 1514A(b)(2)(C). Specifically, to establish a *prima facie* retaliation case, a whistleblower must demonstrate by a preponderance of the evidence (i) that he engaged in protected activity, (ii) that the employer knew of the protected activity, (iii) that the whistleblower suffered an adverse person-

nel action, and (iv) that circumstances exist to suggest that the protected activity was a "contributing factor" in the adverse personnel action. 49 U.S.C. § 42121(b)(2)(B)(i); *see also Collins v. Beazer Homes USA, Inc.,* 334 F.Supp.2d 1365, 1375–76 (N.D.Ga.2004). In the event a whistleblower makes this *prima facie* showing, the employer may nonetheless avoid liability if it demonstrates by clear and convincing evidence that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(ii).

Jennings asserts that by providing information about JDSU's tax problems to Vellequette, he engaged in protected activity, and moreover that he suffered adverse employment action when he was terminated. Further, he points out that Vellequette, the ultimate decisionmaker, knew of Jennings' alleged protected activity. With respect to the causation element, Jennings asserts that his termination was sufficiently proximate in time to the protected activity that a reasonable jury could draw an inference of causation.

JDSU responds by asserting that an inference of causation is unwarranted, and further, that the record shows by clear and convincing evidence that JDSU would have terminated Jennings regardless of his protected activity.

■ Even assuming Jennings has established a *prima facie* case,[6] summary

---

5. Importantly, assuming that Jennings has exhausted administrative remedies is not an impermissible exercise of "hypothetical jurisdiction" prohibited by *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89–101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). That case prohibits resolution of a case on the merits based on the assumption that article III jurisdiction exists. *See id.* at 97 n. 2, 118 S.Ct. 1003. But it permits resolution of merits questions before resolution of statutory jurisdictional questions. *Id; see also Restoration*

*Preservation Masonry, Inc. v. Grove Europe Ltd.,* 325 F.3d 54, 59–60 (1st Cir.2003) (noting that *Steel Co.* is limited to article III jurisdictional disputes and that courts may bypass problematic statutory jurisdictional issues provided they do not implicate the "case or controversy" requirement). Here, assuming proper exhaustion does not implicate the case or controversy requirement.

6. It is far from obvious that a *prima facie* case has been made. First, it is unclear whether the alleged protected activity—reporting tax

judgment is nonetheless warranted. The undisputed facts clearly and convincingly reflect that JDSU would have terminated Jennings for reasons unrelated to his alleged protected activity, to wit, for his admitted disdain for, and deliberate disregard of, JDSU's policies and procedures. No rational factfinder, on this record, could conclude otherwise. Indeed, Jennings himself admitted that the hiring of the temporary employee created the appearance of a conflict of interest, and violated company policy. He further stated he was "prepared to accept the consequences." Jennings' actions in this regard constitute "cause" to fire him within the meaning of his employment contract, which provides further support for the idea that Jennings would have been terminated regardless of his allegedly protected activity. Moreover, Schmidt, Schmidt's HR supervisor, and Acertna's General Counsel all recommended termination on the basis of Jennings' hiring of the temporary employee, as well as other unspecified lapses of judgment, without any knowledge of Jennings' protected activity. Their opinions formed the primary basis for Vellequette's decision, though Vellequette also relied on his own assessment that Jennings was performing inadequately in one of his crucial job functions, namely participating effectively as part of the team working to integrate Acertna's and JDSU's businesses.

Nor is there any evidence in this record that JDSU's stated reasons for firing Jennings were pretextual. Jennings' only evidence in this regard is a comparator from a JDSU subsidiary in Brazil who, Jennings contends, received a lesser form of discipline for a similar offense. While a properly situated comparator may help establish pretext, this comparator is inadequate as a matter of law because he is not similarly situated—he worked in a different office, for a different company, and did not work at the Director level as Jennings did. *See Nichols v. Caroline County Bd. of Education*, 2004 WL 350337 at *7 (D.Md. February 23, 2004), *aff'd* 114 Fed. Appx. 576 (4th Cir.2004) ("to be valid comparators, other employees must be similarly situated in all relevant respects," including, *inter alia*, having dealt with the same supervisor) (internal citations omitted).

In sum, JDSU has clearly and convincingly shown it would have fired Jennings regardless of any alleged protected activity, and no reasonable factfinder could conclude otherwise. Accordingly, summary judgment in favor of JDSU on the Sarbanes–Oxley claim is appropriate.

For the above-stated reasons, for the reasons stated from the Bench,[7] and for good cause,

It is hereby **ORDERED** that JDSU's motion for summary judgment on Jennings' counterclaims is **GRANTED**.

---

problems—is protected by Sarbanes–Oxley. *See JDS Uniphase Corp v. Jennings*, No. 1:06cv200, 2007 WL 431028 at *5 n. 4 (E.D.Va. Feb. 5, 2007) (memorandum opinion granting partial summary judgment). Second, Jennings narrowly avoided summary judgment on causation; his case is tenuous at best. Jennings is correct that Vellequette knew about Jennings' reports of tax problems and terminated Jennings a short time thereafter, which would permit a rational jury to infer that the protected activity was a "contributing factor" in the decision to terminate.

But Jennings ignores the more probative facts that (i) no action was taken against Jennings for raising tax issues until Jennings violated JDSU policy by hiring the temporary employee and (ii) that Jennings reported tax problems with impunity until his improper hiring of the temporary employee.

7. The transcript of the bench ruling reflects that Jennings was mistakenly referred to as "plaintiff" on several occasions. This error did not affect the substance of the ruling.

The clerk is directed to send a copy of this Order to all counsel of record.